# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 1103 | **DATE** | 11/22/2004 |
| **CASE TITLE** | Depke v. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff's Motion for Summary Reversal (doc. #15)
Defendant's Motion for Summary Judgment (doc. #16)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]. Enter Memorandum Opinion and Order. For the attached reasons, Plaintiff's motion for summary judgment (doc. #15) is GRANTED and Defendant's motion for summary judgment (doc. #16) is DENIED. The Clerk is directed to enter judgment reversing the decision of the Commissioner of Social Security and remanding the case to the Social Security Administration for further proceedings.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 2 3 2004 date docketed | 18 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | JHC courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL DEPKE,

    Plaintiff,

    v.

JO ANNE BARNHART, Commissioner
    of Social Security

    Defendant.

Nos. 04 C 1103

The Honorable William J. Hibbler

DOCKETED
NOV 2 3 2004

## MEMORANDUM OPINION AND ORDER

Michael Depke applied to the Social Security Administration for Disability Insurance Benefits under Title II and Supplemental Social Security Income benefits under Title XVI of the Social Security Act. After an administrative hearing, an Administrative Law Judge denied Depke's application on November 29, 2001. The Appeals Council denied Depke's request for review and Depke filed this action to review the ALJ's decision.

On November 23, 1999, Depke filed an application with the SSA for Title II DIB and on December 9, 1999, he filed an application for Title XVI SSI benefits, both alleging that he had become disabled on October 1, 1999, because of his emphysema, osteoporosis, depression, anxiety disorder, obsessive compulsive disorder, and hearing loss. (Tr. 23-25). Following a hearing held on June 6, 2001, an ALJ denied Depke's claim finding that Depke could not perform any of his past relevant work, but that he had the residual functional capacity to perform a significant range of sedentary work or some light exertion work. (Tr. 29). On September 5, 2003, the Appeals Council

1



denied Depke's request for review, causing the ALJ's decision to constitute the final decision of the Commissioner of Social Security. (Tr. 8, 10).[1]

At the time of his application, Depke was 43 years old. (Tr. 323). Depke had finished ninth grade and had worked for 24 years (from 1973-1999, excluding a two year period between 1995 and 1997) as a customer service representative in an automotive parts warehouse. (Tr. 165, 170).

Depke first visited Dr. Greg Daly on June 3, 1999 for a general physical examination. (Tr. 248). At the time, Depke reported some hearing loss, chronic knee pain, and requested a chest x-ray, a knee x-ray, an audiogram, and a referral to an eye doctor. (Tr. 248). A month later, Depke returned to Dr. Daly, who noted that his chest x-ray showed severe bullous emphysema and recommended to Depke that he stop smoking. (Tr. 248). Dr. Daly also noted that Depke appeared to suffer from osteoporosis in his knees and ordered a dexascan to evaluate Depke's bone density. (Tr. 248). The results of the dexascan revealed that Depke suffered from osteopenia in his spine and femoral neck. (Tr. 257).

On October 4, 1999, Depke informed Dr. Daly that he was experiencing some depression and had periodic bouts of depression in the past. (Tr. 247). Dr. Daly recommended that Depke seek psychiatric assistance, prescribed medication to treat his depression, and wrote a note explaining that Depke should refrain from work because of his depression and osteoporosis. (Tr. 247). On October 15, 1999, Depke first visited with Dr. Salvatore Meccia for his depression (Tr. 220). Dr. Meccia wrote a general note requesting that Depke's absence from work be excused (but failing to specify

---

[1] Normally, a person has 60 days after receiving the Appeals Council's decision to file a petition for review with the District Court. 42 U.S.C. § 405(g). The Commissioner, however, may extend this time. 42 U.S.C. § 405(g). In this case, on January 14, 2004, the Commissioner sent Depke a letter, allowing him to file a petition for review within 30 days from receipt of that letter. (Tr. 8). Depke filed this claim on February 12, 2004.

any time-period for the absence), and noting that his next appointment was scheduled for October 22. (Tr. 220). Dr. Meccia diagnosed Depke with depression and a moderate anxiety disorder and prescribed Paxil for his depression and clonazepam to address his anxiety disorder. (Tr. 218, 263).

On October 29, 1999, Depke saw Dr. Richard S. Crawford for further evaluation of his osteoporosis. (Tr. 208-10). Dr. Crawford observed that Depke was "still somewhat young to develop his degree of bone loss." (Tr. 210). Dr. Crawford also recommended that Depke refrain from heavy-lifting (70 pound weights) and suggested that Depke may need to change jobs if heavy-lifting continued to be a requirement of his employment. (Tr. 210). Dr. Crawford prescribed medication to treat his osteoporosis and recommended further tests to "rule out other etiologies of osteoporosis." (Tr. 210). A week later, Dr. Daly wrote Depke a short note on a prescription form, stating that Depke was "completely disabled [and] no longer capable of manual labor of any kind." (Tr. 242). On November 12, Dr. Daly wrote a memo, opining that Depke "will be medically disabled for greater than one year." (Tr. 241). Early in 2000, Dr. Daly began prescribing Celebrex to help Depke control the pain resulting from the osteoporosis. (Tr. 240). Depke also tried other prescription medication as well as Tylenol to control his pain, but had only transient or incomplete relief. (Tr. 285, 302). A year later, in October 2000, Dr. Crawford speculated that degenerative joint disease was causing Depke's pain, noting that his osteopenia would not normally cause joint pain and suggesting an orthopedic or rheumatology referral. (Tr. 286).

As a result of his application for DIB and SSI benefits, Depke had several consultative examinations. Dr. Maung Win conducted a 30-minute examination of Depke on December 11, 1999. (Tr. 227-230). Dr. Win found no spinal deformities and observed a full range of motion without any paraspinal tenderness or spasm. (Tr. 229). Dr. Win, however, could not delineate a

3

cause for Depke's knee pain but would not rule out metabolic bone disease. (Tr. 230). On January 5, 2000, Dr. Ashok Gupta performed a 45-minute consultative psychiatric examination of Depke. (Tr. 235-237). Depke complained to suffer from anxiety attacks every other day that limited him to the house. (Tr. 235). Dr. Gupta observed that both mood and affect were depressed and that Depke's speech was underproductive with decreased spontaneity. (Tr. 236). Dr. Gupta diagnosed panic disorder with agoraphobia and an adjustment order with depression. (Tr. 236). Dr. Gupta noted Depke's GAF(global assessment of functioning) was 55, placing Depke's symptoms in the moderate range. (Tr. 237).

Several doctors examined Depke's medical records to evaluate his limitations. Dr. Mohan Singh found that Depke had a severe impairment that did not meet or equal a listed impairment and thus required a residual functional capacity (RFC) assessment. (Tr. 276). Dr. Singh concluded that Depke had slight restrictions upon daily living, slight to moderate difficulties in maintaining social functioning, and seldom to often experienced deficiencies in concentration. (Tr. 283). Charles S. Harris, Ph.D., then assessed Depke's RFC, finding that his mental impairments were mildly to moderately severe and would somewhat restrict his pace, concentration, and adaptation in detailed jobs. (Tr. 266). Harris also found that Depke was moderately limited in his ability to interact appropriately with the general public. (Tr. 265). Ultimately, Harris concluded that Depke was capable of performing simple, unskilled jobs. (Tr. 266). Dr. Henry S. Bernet found that Depke's osteoporosis limited him to lifting no more than 50 pounds occasionally and 20 pounds frequently, standing or walking no more than 6 hours a day, and required him to avoid moderate exposure to environments with excess noise or vibration. (Tr. 270-272).

4

In addition to the RFC evaluations, the DDS also received a psychiatric report from Dr. Meccia. (Tr. 261). As of March 24, 2000, Dr. Meccia noted that Depke had decreased sleep, appetite, and concentration and increased anxiety and depression. (Tr. 261). Dr. Meccia commented that Depke's psychological limitations were secondary to his physical limitations. (Tr. 261). But ultimately, Dr. Meccia concluded that Depke was unable to work because of his physical disability and decreased concentration and focus. (Tr. 263). In June 2000, Dr. Daly wrote a clinical note explaining that he believed Depke was clearly disabled and had great difficulty walking. (Tr. 302). Three months later, Dr. Daly repeated his belief that Depke was unable to perform "any type of official labors" and observed that Depke was severely depressed. (Tr. 303).

At the hearing before the ALJ, Depke testified that he cooked and cleaned with some difficulty, requiring frequent breaks, and shopped two or three times a week for short trips. (Tr. 47-48, 66-67). Depke testified that after walking for one block, he would need to take a break because of the pain in his knees and also that after 15-20 minutes of sitting his knees would stiffen. (Tr. 50, 63). He rated his pain as a 9 on a 1-10 scale. (Tr. 59). Depke explained that he did not feel depressed because the medication and visits with his psychiatrist had helped him. (Tr. 56-57). But Depke also testified that he suffered from about five 10-minute panic attacks per week. (Tr. 57-58).

Dr. Irving Zitman reviewed Depke's medical records and also testified at Depke's hearing. (Tr. 68). Dr. Zitman testified that there was insufficient evidence to determine the severity of Depke's complaints, but that they "sound[ed] severe." (Tr. 69. 74). Dr. Zitman testified that there was no evidence that Depke suffered from a degenerative disease and no test had been done to determine whether Depke suffered from an inflammatory arthritic disease. (Tr. 69-70). Dr. Zitman opined that Depke's treating doctors did not know what is wrong with Depke, that the osteopenia

and osteoporosis that he suffered from were asymptomatic, and that the lack of bone density revealed by the dexascan should not cause any pain unless the bones began to break. (Tr. 70-72). Dr. Zitman also noted that the medicine taken by Depke had been working, as his bone density had increased by three-and-a-half percent. (Tr. 75). Dr. Zitman testified that a battery of tests would be needed to determine the causes of Depke's pain, but that he believed him to be credible. (Tr. 76-77).

Dr. Zitman noted that there was evidence of osteoarthritis two years ago (when Depke first filed the claim), but that it might have worsened. (Tr. 77). Initially, Dr. Zitman believed that Depke was capable of performing light work. (Tr. 77). But when cross-examined, Dr. Zitman testified that he did not believe Depke could stand 6 hours a day, which is a threshold for performing light work. (Tr. 79). After further cross-examination, Dr. Zitman testified that the medical evidence in the record was insufficient to make any assessment of Depke's RFC. (Tr. 80). Dr. Zitman explained that two other doctors (Dr. Crawford and Dr. Daly) opined that Depke suffered from a degenerative joint disease but he saw no evidence of it in the record. (Tr. 84-85). Nevertheless, Dr. Zitman opined that he "think[s] [Depke's] got it, too." (Tr. 85).

Finally, the ALJ asked the vocational expert to assume that Depke was capable of light exertional work of an unskilled an simple nature, could stand for four hours and sit for six hours in an eight hour workday, could occasionally climb stairs, but not ladders, could not squat or crouch, but could frequently stoop or kneel, and needed to avoid prolonged exposure to high levels of noise, vibrations or pollutants. (Tr. 89-90). The vocational expert then testified that assuming the limitations described, a person could perform light jobs in assembly (8,000 in region), hand packaging (7,000 in region), and inspection (6,500) in region. (Tr. 90). The vocational expert also
6

testified that no work would be available for Depke under Dr. Daly's May 2001 RFC or if Depke's testimony was fully credible. (Tr. 91-92).

As a result of Dr. Zitman's testimony that he could not draw a conclusion from the medical evidence in the record, a final consultative examination was conducted on July 16, 2001, after Depke's hearing. (Tr. 309-319). Dr. Richard Shermer reviewed Depke's medical records and observed that x-rays taken that day showed spurring and degenerative changes in his lumbar spine, hips, knees, and ankles. (Tr. 314). Dr. Shermer also noted that Depke's gait pattern was unsteady on getting up. (Tr. 316). Dr. Shermer concluded that Depke could lift 20 pounds, stand or walk for about 6 hours of an 8-hour work day, and occasionally climb, balance or kneel. (Tr. 317-319). Dr. Shermer further concluded that Depke should avoid work environments with temperature extremes, odors, hazards, or excess humidity. (Tr. 320).

The ALJ found Depke not to be fully credible. (Tr. 26). According to the ALJ, the "medical evidence shows only some mild degenerative joint disease . . . that does not cause pain or other symptoms." (Tr. 26). The ALJ also concluded that according to the testimony of Dr. Zitman the medical assessment provided by Dr. Daly should be rejected because his conclusions lacked support in the medical evidence of record. (Tr. 26). As a result, the ALJ adopted the assessment provided by Dr. Shermer, which he concluded were consistent with the objective medical evidence. (Tr. 26). The ALJ concluded that Depke could perform a significant range of sedentary work and some light exertion work, and relied on the vocational expert's testimony that there were several thousands of jobs in the Chicago area that a person with the limitations found by the ALJ could perform. (Tr. 28-29).

7

On review, a court should affirm the Commissioner's final decision if there is sufficient evidence on record that a reasonable mind might accept as adequate to support the same conclusion. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Although a court reviews the entire record, it may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The ALJ, however, must rationally articulate the grounds for the decision and build an accurate and logical bridge from the evidence to the conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

Having reviewed the record and the parties' briefs, the Court concludes that the ALJ's ruling must be reversed and the case remanded for further consideration. Although the ALJ's credibility determinations normally are entitled to special deference because of the ALJ's ability to observe and evaluate testimony, they must also be sufficiently specific to allow meaningful appellate review. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security Rule 96-7p requires ALJ's to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p(4); *see also Steele*, 290 F.3d at 941-42 (ALJ must contain "specific reasons" for a credibility finding and may not simply invoke SSR 96-7p). Further, SSR 96-7p precludes an ALJ from disregarding an individual's statements about the intensity or persistence of pain or other symptoms in the record "solely because they are not substantiated by objective medical evidence." SSR 96-7p(4); *see also Indaranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Scheck v.*

*Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). That is, however, precisely what the ALJ did here. The ALJ rejected Depke's claims of severe pain in five short lines:

> I do not find the claimant to be fully credible. The medical evidence shows only some mild degenerative joint disease, mainly at the knees. His osteoporosis, or its milder version, osteopenia, is a risk factor (for increased chance of fracture) which would probably make heavy lifting inadviseable [sic], but does not cause pain or other symptoms. Thus, I find the claimants allegation of pain in all joints without medical support and lacking credibility.

The ALJ never explains why he finds Depke's claims not to be credible, except that they lack medical support in the record—a ground not permitted as the sole basis to determine credibility. Nowhere does the ALJ explain precisely what evidence he relies upon to conclude that "the medical evidence shows only some mild degenerative joint disease." Nowhere does the ALJ address the fact that Depke's treating physicians prescribed medication for his pain. Nowhere does the ALJ consider Depke's accounts of the limitations of his daily activities. Nowhere does the ALJ address Dr. Zitman's opinion that, although the medical evidence was inconclusive, he found Depke to be credible. Nowhere does the ALJ address the fact that two doctors concluded that Depke suffered pain from a degenerative joint disease. Nowhere does the ALJ address Dr. Zitman's belief that these doctors' assessments of Depke's degenerative joint disease are accurate. Nowhere does the ALJ address Dr. Zitman's testimony that there is evidence of osteoarthritis that may have worsened between 1999 and 2001. The ALJ simply concludes, without any sort of meaningful explanation of that conclusion, that Depke's "allegations of pain [are] . . . without medical support" and therefore "lacking [in] credibility." This violates SSR 96-7p and was improper.

Furthermore, the ALJ also improperly rejected the opinion of Depke's treating physician. If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must support that decision with "good reasons." 20 C.F.R. § 404.1527(d)(2). The contrary opinion of a

9

non-examining physician, in and of itself, is not sufficient reason to reject the opinion of the treating physician. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Here, the ALJ chooses to reject the findings of Depke's treating physician based on assumptions that are mistaken. The ALJ "agree[s] with the medical expert at the hearing that the medical assessment provided by Dr. Daly is to be rejected." But that is not an accurate interpretation of Dr. Zitman's testimony. Dr. Zitman testified that there was insufficient evidence *for him* to determine the severity of Depke's complaints, not that Dr. Daly's assessment should be rejected. Dr. Zitman, however, went on to explain that he believed Depke's complaints to be severe, that he believed Depke to be credible, and that he believed Depke's treating physicians (Drs. Daly and Crawford) were likely correct when they diagnosed him with degenerative joint disease. In other words, Dr. Zitman never went so far as to suggest that Dr. Daly's RFC assessment should be rejected — only that he lacked evidence to draw a conclusion. Such an inconclusive opinion cannot form the basis to reject the opinion of a treating physician. *Gudgel*, 345 F.3d at 470.

In this case, the ALJ wholly failed to make a reasonable connection between the evidence and his finding that Depke was not credible and his decision to reject the opinion of Depke's treating physician. The ALJ's opinion ignores the directives of SSR 96-7p in making credibility determinations and relies upon mistaken and patently wrong interpretations of Dr. Zitman's testimony. In short, the ALJ never justifies his conclusions sufficiently to permit meaningful review and this case must be remanded to the Social Security Administration for further proceedings consistent with this opinion.

IT IS SO ORDERED.

11/22/04                         *Wm. J. Hibbler*
Dated                            The Honorable William J. Hibbler
                                 United States District Court